## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| PEDRO MUNIZ, | § | |
| (Reg. #99022-179), | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-12-1813 |
| | § | |
| UNITED STATES of AMERICA, *et al.,* | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND OPINION

Pedro Muniz, a federal inmate proceeding *pro se* and *in forma pauperis,* sued  a number of medical-service providers working for the Federal Detention Center in Houston, Texas.  Muniz also sued the United States, the Bureau of Prisons, and the United States Attorney's Office.  Muniz alleged that the individual defendants deprived him of medical care and sought damages under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2674, from both the individual and government defendants.  The defendants have now moved to dismiss or for summary judgment. Muniz filed a response, and the defendants replied.  (Docket Entry Nos. 20, 21, 22, 23).  Based on the pleadings; the motion, response, and reply; the record; and the applicable law, this court grants the motion and enters a separate order of final judgment dismissing the case with prejudice.  The reasons for this ruling are set out in detail below.

### I.      Muniz's Allegations

Muniz alleges that on May 11, 2010, he went to the Federal Detention Center infirmary for a swollen toe.  Dr. Roberto Garza diagnosed an infection.  (Docket Entry No. 8, Plaintiff's More Definite Statement, p. 2).  Muniz alleges that he was prescribed the "wrong" antibiotic and his toe

became worse.  Muniz alleges that when he complained, the FDC medical staff told him that his toe was getting worse because he was not controlling his diabetes.

Muniz alleged that his mother contacted Congresswoman Sheila Jackson Lee and that, as a result, Muniz was taken to a free-world physician two months after the initial infection.  He saw Dr. Barnes, who warned Muniz that he could lose his toe.  Dr. Barnes prescribed antibiotics, which led to improvement, and Muniz was released.  Muniz missed the scheduled follow-up appointment with Dr. Barnes two weeks later because the FDC refused to take him, claiming that he had a blood clot in his leg that made it dangerous for him to travel.  (Docket Entry No. 8, Plaintiff's More Definite Statement, p. 3).  Muniz alleges that though he continued to take the antibiotics, the infection spread to the bone, and the toe had to be amputated on September 22, 2010.  (Docket Entry No. 8, Plaintiff's More Definite Statement, p. 3).  Muniz was hospitalized for one week.  He alleges that the FDC was negligence because it delayed treating the infection, did not treat him aggressively from the beginning, and in delaying getting Muniz to his follow-up visit.  Muniz alleges that the negligence caused to lose his toe.

Muniz alleges that under Texas tort law, FDC Houston staff and employees owed him a duty to follow the outside physician's recommendation, which set the standard of care.  Muniz alleged that Dr. Barnes's instruction that he return in two weeks for a follow-up visit established the standard of care and provided expert opinion that the delay was negligent.  Muniz alternatively argues that the two-week follow-up appointment is the standard of care based on common knowledge or on *res ipsa loquitur*.

Muniz filed an amended complaint alleging a civil-rights deprivation and adding as defendants FCI-II Butner (Butner Legal Center), the United States Attorney's Office, Civil Division,

and the United States.  (Docket Entry No. 4).  Muniz sought $1,000,000.00 in compensatory damages for the loss of his toe.

In September 2012, the court ordered Muniz to provide a more definite statement of his claims.  (Docket Entry No. 7).  In response to a question asking how his civil rights were violated, Muniz stated: "(2) Plaintiff Muniz is not making a civil rights violation claim, he is making a Medical Negligence claim under the FTCA, however, his civil right to good medical care was violated by the medical negligence of employees— at FDC Houston—of the United States."  When asked to list the names of each defendant who allegedly violated his civil rights, Muniz responded: "(3) The medical staff at FDC Houston, employees of the United States were medically negligent for failing to properly address my medical issues regarding my toe. . . ."  (Docket Entry No. 8). Muniz stated that he was alleging a civil-rights claim as well as a negligence claim.  Both must be considered.

Muniz sued the federal government under the Federal Tort Claims Act.  Under the FTCA, no action may be brought against the United States unless the claimant first presents the claim to the appropriate federal agency.  28 U.S.C. § 2675(a).  Muniz met the FTCA's administrative exhaustion requirement.  On March 6, 2012, the BOP South Central Regional Counsel, Jason A. Sickler, denied Muniz's tort claim and informed him that he had six months to file suit in federal court.  Muniz filed this suit on June 18, 2012, within the six months.

The defendants have moved to dismiss the civil rights claims against the United States, its agencies, and its employees for lack of jurisdiction, for failure to state a claim, and for failure to exhaust administrative remedies under the Prison Litigation Reform Act (PLRA), 42 U.S.C. §

1997e(a).  The United States has also moved to dismiss the FTCA claims against the federal agencies and employees.

Muniz moved to supplement his response with an affidavit of an expert witness, a nurse practitioner.  (Docket Entry No. 21).  The defendants moved to strike this witness, arguing that she is not a physician, and that her opinions are not sufficiently reliable under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579 (1993).  (Docket Entry No. 22).

Each argument and response is analyzed below.

## II.    The Evidence in the Record

The defendants submitted the following evidence:

(A)    a declaration of Dr. Roberto Garza, M.D.;

(B)    a U.S. Dept. of Justice, Federal Bureau of Prisons, denial letter;

(C)    the declaration of Tamala Robinson, a legal assistant at the Bureau of Prisons;

(D)    the declaration of Tara Ross, a nurse at the FDC; and

(E)    the declaration of Oanh Vo, a nurse at the FDC.

Roberto Garza testified as follows:

1.    I am presently employed by the Federal Bureau of Prisons (BOP) as Staff Physician at the Federal Detention Center in Houston, TX (FDC Houston).  I have held this position since September 2005.

2.    I have been a licensed Physician since July 2000.  I specialize in Family Practice[.]

3.    I have read, and am familiar with, the Complaint filed by Plaintiff, Pedro Muniz, reg. no. 99022-179, (Muniz) in the above referenced lawsuit.

4.    I am familiar with Muniz's medical records maintained in the BOP's Bureau Electronic Medical Records (BEMR) database that reflect the following:

5.     On January 12, 2010, Muniz arrived at Federal Detention Center (FDC), Houston, with a diagnosis of Insulin dependent Type II Diabetes, chronic kidney disease with a 25% function, Hypertension, High Cholesterol, and Obesity. He measured 5 feet, seven inches tall, and weighed two hundred and fifty[-] seven pounds.

6.     On May 11, 2010, he reported to Health Services department "sick call" and was seen by Mid-Level Practitioner Patrick Osayande for complaints of right foot infection and was started on antibiotics (Amoxicillin/Clav) for ten days, and was told to keep the digit clean.   Muniz was assessed with cellulitis and abscess of foot.   Also, on May 11, 2010, I ordered another antibiotic, Sulfamethoxazole/trimeth for 14 days.

7.     Cellulitis is an infection of the skin, whereas an abscess is where the skin infection has concentrated itself in a certain area.

8.     Amoxicillin/Clav is a combination antibiotic frequently utilized to treat cellulitis.   Sulfamethoxizole/trim is also a combination antibiotic which also works well against skin infections, covering other bacteria which other antibiotics may not cover.

9.     Due to his numerous health issues, Muniz was evaluated again the next day, May 12, 2010, by the Clinical Director, Dr. Anthony Cubb, for chronic care purposes.   At that time, Dr. Cubb attempted to educate him on the importance of adhering to his diet and insulin regimen, and the importance of losing weight.   Complying with a strict diet, and restricting the intake of sugars and carbohydrates can limit the use of insulin therapy.   Patients often do not adhere to a strict diet and prefer to have insulin manage their eating habits instead of their diabetes, thus leading to complications, as in this case, of circulation which can result in amputation.   Dr. Cubb told Muniz to make himself available for daily clinic wound care, and stressed the importance of adhering to the antibiotic regimen.   However, Muniz became belligerent about being started on dialysis, for which he was not a candidate at that time.

10.    Dr. Cubb also noted that Muniz appeared to possibly have toe trauma and peripheral vascular disease, and was under care at that time.   Peripheral vascular disease had resulted from poor

circulation due to his diabetes.  Diabetes affects many systems and the vascular system is very prone to its affects.  This best deterrent is proper diet/weight management/medical therapy control of one's health.

11.     Later that same day, Muniz was seen by Mr. Osayande for a follow up on his toe.  His dressing was changed and dressing materials were provided for self care, with instructions to follow up every other day.

12.     I then saw Muniz on May 21, 2010.  During that visit, I noted that the blister was healing well between the 4th and 5th toes. Muniz reported that his right foot pain had been improving since being on Augmenting[sic] and Bactrim.   The Amoxicilin/Clav was continued for 10 days, and the Sulfamethoxazole/trimeth was continued for 14 days. Additionally, Mupirocin Ointment, a topical antibiotic that is able to act locally on the infection, was prescribed for 14 days.

13.     On June 11, 2010, Muniz presented to Nurse Tara Ross and reported hitting his toe on something in his cell which opened a wound and caused excessive bleeding.  The wound was cleaned with peroxide and betadine, and then dressed. Ciproflaxacin was ordered for 10 days and Sulfamethoxazaole/trimeth was order[ed] for 10 days. Ciprofloxin is yet another antibiotic which can be used for skin infection, but also serves a role in bone infections.  Since the patient admitted to recent trauma, it was prudent to prescribe Ciprofloxin.  Muniz was again instructed on the importance of keeping his foot clean and dry.

14.     Muniz was seen again on June 22, 2010 by a Mid Level Practitioner and reported that he had been working to get his toe less infected and it was getting better.  He reported the Cipro was working well.  The clinician noted the fourth toe had a 10mm round and 3mm deep ulceration caused by pressure from the fifth toe pushing against it.  It was noted that the area had shown vast improvement since the treatment with antibiotics.  Nystatin Cream and Silver Sulfadiazine Cream were ordered for 90 days.  Nystatin is an anti-fungal topical medication for "athletes feet" and silver sulfadiazine may be used in conjunction to prevent a secondary skin infection.

15.     On June 25, 2010, a prescription for Ciproflaxacin was ordered for 15 days.

16.     On July 1, 2010, Muniz was escorted by U.S. Marshals to St. Joseph Medical Center, and was evaluated by an outside orthopedist, Dr. Frank L. Barnes. Dr. Barnes admitted Muniz to the hospital for osteomyelitis, to receive intravenous (IV) antibiotics, and noted probable amputation of the toe. Muniz remained in the hospital until July 5, 2010. When he was discharged, his home care instructions recommended an antibiotic Levaquin (250mg by mouth daily), NPH insulin (18 units subcutaneously daily) and a hypertension medication Norvasc (5mg by mouth daily).

17.     Osteomyelitis is an infection of the bone caused by different organisms. It may or may not be a complication of a cellulitis/abscess/diabetes, but in this case, most likely, was. Levaquin is in the same class of antibiotics as Cipro and both are often prescribed for osteomyelitis seen in diabetics.

18.     After discharge from the hospital, Muniz was briefly taken to a privately contracted facility, the Joe Corley Detention Center. He then returned to FDC Houston on July 7, 2010, and was seen by me. 250mg of the antibiotic Levofloxacin (which is synonymous with Levaquin) was ordered for 60 days. This was consistent with Dr. Barnes home care instructions July 5, 2010. Additionally, consistent with the home care instructions of July 5, 2010, an order for 18 units of NPH insulin subcutaneous daily was renewed for 180 days, as was an order for Amlodipine (the generic form of Norvasc) for 180 days. Acute osteomyelitis was indicated.

19.     Muniz was seen again on July 16, 2010, and reported that the ulcer on his toe was improving.

20.     On July 19, 2010, Muniz was seen again by Dr. Barnes who recommended continuing the antibiotics. Dr. Barnes recommended that he return in two weeks. However, during that time, Muniz developed and was treated for a possible blood clot in his right calf. On August 13, 2010, I examined him and diagnosed venous embolism thrombosis superficial LE, and prescribed Ibuprofen and aspirin for 7 days. Due to the severity of potential complications from a blood clot, which include possible vascular disease, skin infections, heart attacks, strokes and even death, I wanted to ensure that the

blood clot was resolved before sending Muniz outside the facility to Dr. Barnes.

21.    Moreover, opinions by outside consultants such as Dr. Barnes are always considered recommendations.  Often they are followed, but ultimately the medical staff at FDC Houston will make the determinations they think are the best course of action. In this case, it was more prudent to postpone Muniz's return to Dr. Barnes, given the potential for complications from blood clots.  Additionally, Dr. Barnes['s] actual substantive recommendations regarding the course of medicine (i.e. continuing antibiotics) were being followed at that time.  Therefore, it was not mandatory to return Muniz to Dr. Barnes in a particular time frame, given that he was receiving proper medical treatment at FDC Houston.

22.    On September 9, 2010, Muniz was seen and I noted resurfacing of his right calf pain and tenderness, and ordered Enoxaparin injection daily for 7 days.  I noted to begin lovenox daily for 1 week and re-evaluate.

23.    After receiving treatment for his blood clot, Muniz was returned to Dr. Barnes for a follow up on September 14, 2010.  At that appointment, Dr. Barnes recommended amputation of his right fourth toe.

24.    On September 14, 2010, Muniz had a post-consultation encounter.  At that time, Levofloxacin was ordered for 30 days.

25.    On September 27, 2010, Muniz was taken to an outside hospital for amputation of his toe.  He returned to FDC Houston on October 4, 2010.  His recovery over the next several months was uneventful.  He was transferred to the Correctional Complex in Butner, North Carolina on February 18, 2011.

26.    Ultimately, Muniz's toe required amputation due to a worsening of his condition, and not due to improper care.  The poor circulation and poor nerve sensation associated with diabetes frequently lead to toe infections.  In turn these infections frequently progress in diabetics, often resulting in the loss of the toe, despite proper care.

27.    In Muniz's case, the documented course of treatment, including antibiotics was proper.  His toe was amputated despite proper care, due to the worsening of his condition.

> All documented medical treatment provided to Muniz was appropriate, and met the appropriate standard of care.

(Docket Entry No. 20-1, Ex. A, pp. 2-9).

In his opposition to the summary judgment motion, Muniz submitted the affidavit of Ofelia Veronica Espinosa, R.N.  She testified as follows:

> (1)     My Name is Ofelia Veronica Espinosa
>
> . . . .
>
> (3)     At the present time I work for The Heights of Tomball
>
> (4)     My occupational Title is:  Director of Nursing, RN, BSN WOCN
>
> (5)     As a registered nurse for more than 30 years and 11 years of WOCN (Wound, Ostomy and Continence Specialist, I have provided medical care to a great number of patients with wounds that have been diagnosed to have Osteomyelitis, which is a bone infection caused by bacterial infection.
>
> (6)     Osteomyelitis secondary to vascular insufficiency is often associated with diabetes mellitus. Infection often results from minor trauma to the feet, such as infected nail beds or skin ulceration. Inadequate tissue perfusion limits local tissue response to injury.
>
> (7)     Multiple organisms are responsible for Osteomyelitis in different populations.  The causative organism is related to the age, clinical history, and immune status of the patient.  S.aureus is the most common cause in all cases S.aureus and occasionally Enterobacter or Streptococcus species.
>
> (8)     Most strains of Staphylococcus aureus are now resistant to penicillin, and methicillin-resistant strains of S.aureus (MRSA) are common in hospitals and are emerging in the community. Penicillinase-resistant pencillins (flucloxacillin, dicloxacillin) remain the antibiotics of choice for the management of serious methicillin-susceptible S.aureus (MSSA) infections, but first generation cephalosporins (cefazolin, cephalothin and cephalexin), clindamycin, lincomycin and erythromycin have important therapeutic roles in less

serious MSSA infections such as skin and soft tissue infections or in patients with penicillin hypersensitivity, although cephalosporins are contra-indicated in patients with immediate penicillin hypersensitivity (urticaria, angioedema, bronchospasm or anaphylaxis).

(9)     All serious MRSA infections should be treated with parenteral vancomycin or, if the patient is vancomycin allergic, teicoplanin. Nosocomial strains of MRSA are typically multi-resistant (mrMRSA, and mrMRSA strains must always be treated with a combination of two oral antimicrobials, typically rifampicin and fusidic acid, because resistance develops rapidly if they are used as a single agents.

(10)     New antibiotics such as linezolid and quinupristin/dalfopristin have good antistaphylococcal activity but are very expensive and should be reserved for patients who fail on or are intolerant of conventional therapy or who have highly resistant strains such as HVISA (heterogenous vancomycin-intermediate S.aureus).

(11)     Several diagnostic modalities are used to determine the presence of Osteomyelitis, including laboratory tests, radiographic imaging, radionuclide studies, and cross-sectional imaging. The gold standard for diagnosing Osteomyelitis is bone biopsy and culture.

(12)     Treatment of Osteomyelitis involves both antimicrobial therapy, with administration of antibiotics for at least 4 to 6 weeks, and surgical intervention, which involves debridement, dead space management, and bone stabilization.

Furthermore on August 13, 2010, Mr. Pedro Muniz was diagnosed with venous thrombosis of the right lower extremity and was prescribed Ibuprofen and aspirin.

The standards of care for this condition are initiation of anticoagulant therapy using:

(1)     A. Fractionated, Low Molecular Weight Heparin (LMWH) (SC Administration), Lovenox 1 mg/kg (maximum dose 150 mg) every 12H.

(2)     B. Unfractionated Heparin(IV Administration)
Initial bolus 60 Units/kg (not to exceed 5000 Units; 4000 Units MAX with tPA and related fibrinolytics).
Initial infusion Dose Initial MAX rate

Low intensity (e.g. ACS) 15 UNITS/hr. 1200 units/ and tPA or GPIIb/IIIa receptor antagonist 12 Units/kg/hr. 1000 units/hr. High intensity 18 units/kg/hr. 1800 units/hr.

(3)     C. Candidates for Anticoagulant Therapy
Obtain baseline aPTT, PT (INR), CBC with platelet count.
Screen for contraindications; assess bleeding risk.
Heme test stool.

Check platelet count every 3 to 5 days during therapy (daily if decrease is observed to evaluate for possible heparin-induced thrombocytopenia (HIT).

(4)     II. WARFARIN ANTICOAGULATION
Indication Target
INR Range
Prophylaxis of venous thrombosis (high-risk patients) 2.5 (2-3)
Treatment of venous thrombosis (after heparin) 2.5 (2-3)  Aspirin (81 to 162 mg PO qd) or clopidogrel (75 mg PO qd) can be used as an adjunct to warfarin in high-risk patients, but no alone therapy.
***A target INR of 2.5 (range 2.0-3.0) plus aspirin (81mg) is also acceptable. Note that Ibuprofen and aspirin is not the standard of care to treat Mr. Pedro Muniz blood clot, and proper medication therapy was not initiated until September 9, 2010 when he started Lovenox (Enoxaparin) injections.

A.     After reviewing the affidavit provided by Dr. Garza, and reviewed the treatment plan provided to Mr. Muniz for his conditions. It is in my professional opinion that the treatment provided to treat Mr. Muniz Osteomyelitis was not the standard of care. Based on the lack of additional laboratory cultures and sensitivity to identify the best antibiotic therapy to treat the Osteomylitis caused by the unknown bacterial infection.

B.     It is my further opinion the lack of identification of the bacteria causing the Osteomylitis infection resulted in the amputation of Mr. Muniz toe.

(Docket Entry No. 21, Attachment 1, pp. 3-5).

This court analyzes the defendants' motions and the evidence under the applicable law.

## III.    The Applicable Legal Standards

Because the parties have submitted evidence outside the pleadings and the defendants have moved for summary judgment, the motion to dismiss for failure to state a claim under Rule 12(b)(6) is moot.  The evidence is considered in deciding the Rule 12(b)(1) challenge to subject-matter jurisdiction and the Rule 56 summary judgment motion.

### A.    The Motion to Dismiss for Lack of Jurisdiction

A Rule 12(b)(1) motion challenges a court's subject-matter jurisdiction. *Lane v. Halliburton,* 548, 557 (5th Cir. 2008).  In ruling on a Rule 12(b)(1) motion to dismiss, the court may rely on (1) the complaint alone, presuming the allegations to be true, (2) the complaint supplemented by undisputed facts, or (3) the complaint supplemented by undisputed facts and by the court's resolution of disputed facts.  *Den Norske Stats Oljeselskap As v. HeereMac Vof,* 241 F.3d 420, 424 (5th Cir. 2001); *see also Barrera–Montenegro v. United States,* 74 F.3d 657, 659 (5th Cir. 1996).

### B.    The Motion for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.,* 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-25 (1986)).  If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing'— that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *See Celotex,* 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a material factual dispute, the party does not need to negate the elements of the

nonmovant's case.  *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted).  "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law."  *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted).  "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response."  *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on its pleading allegations.  The nonmovant must identify specific evidence in the record that supports its claim.  *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007).  "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"  *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075).  In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## IV.    The Civil Rights Claims

### A.    The Claims Against Defendants in their Official Capacities

Muniz sued the United States of America, the Bureau of Prisons at FDC Houston, FCI-II Butner, the United States Attorney's Office, Civil Division, and FDC employees, Dr. Roberto Garza, Dr. Anthony Cubb, Patrick Osayande, Tara Ross, R.N., and Vo Oanh, R.N., in both their official and individual capacities.  (Docket Entry No. 1, Complaint, p. 1).  A civil-rights damages claim against the United States cannot proceed.  *See Gibson v. Fed. Bureau of Prisons,* 121 F. App'x 549, 551

(5th Cir. 2004). A civil-rights damages claim against a federal officer in his official capacity is also barred because official capacity suits against federal employees are treated as suits against the United States. *See Kentucky v. Graham,* 473 U.S. 159, 165-67 (1985); *Affiliated Prof'l Home Health Care Agency v. Shalala,* 164 F.3d 282, 286 (5th Cir. 1999). Muniz's civil-rights claims against the United States, the Bureau of Prisons at FDC Houston, FCI-II Butner, the United States Attorney's Office, Civil Division, and against Dr. Roberto Garza, Dr. Anthony Cubb, Patrick Osayande, Tara Ross, and Vo Oanh in their official capacities, are dismissed.

### B. The Civil-Rights Claims Against the Individual Defendants in their Individual Capacities

A prisoner must exhaust all available administrative remedies before suing federal prison employees. 42 U.S.C. § 1997e(a); *Porter v. Nussle,* 534 U.S. 516, 524 (2002). "[T]he PLRA exhaustion requirement requires proper exhaustion." *Woodford v. Ngo,* 548 U.S. 81, 93 (2006). A prisoner "must complete the administrative review process in accordance with the applicable procedural rules—rules that are defined not by the PLRA, but by the prison grievance process itself." *Jones v. Bock,* 549 U.S. 199, 218 (2007) (internal citation and quotation marks omitted). The Fifth Circuit takes "a strict approach to the exhaustion requirement." *Days v. Johnson,* 322 F.3d 863, 866 (5th Cir. 2003), *overruled by implication on other grounds by Jones,* 549 U.S. at 216. "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules." *Woodford,* 548 U.S. at 90. An inmate's grievance must be sufficiently specific to give "officials a fair opportunity to address the problem that will later form the basis of the lawsuit." *Johnson v. Johnson,* 385 F.3d 503, 517 (5th Cir.2004).

Failure to exhaust administrative remedies under the PLRA is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Carbe v. Lappin*, 492 F.3d 325, 327 (5th Cir. 2007). The defendants have the burden on summary judgment to establish that Muniz did not exhaust the available administrative remedies.

The defendants submit a declaration from Tamala Robinson, a legal assistant at the FDC Houston. She stated the following:

1. I am presently employed with the U.S. Department of Justice as a legal assistant for the Federal Bureau of Prisons (BOP) in Houston, Texas.

2. The statements I make hereinafter are made on the basis of my review of the official files and records of the BOP, my own personal knowledge, or on the basis of information acquired by me through the performance of my official duties.

3. I am familiar with the administrative remedy process provided and followed by the BOP. Pursuant to my official duties, I have access to records maintained in the ordinary course of business by BOP, including SENTRY, a computerized index of all administrative remedy requests filed with the BOP, reflecting attempts to seek and exhaust administrative remedies under 28 C.F.R. § 542.10 et seq and Program Statement 1330.16, Administrative Remedy Program.

4. As set forth in 28 C.F.R. §§ 542.10-542.19, the BOP makes available to its inmates a three-level administrative remedy process in the event that informal resolution procedures fail. The purpose of this administrative remedy process is to permit inmates to seek formal review of an issue relating to any aspect of his/her own confinement and to permit the agency an opportunity to employ its expertise to redress grievances concerning the BOP. Among other items, this process must be invoked and exhausted when inmates allege that certain terms of their confinement are in violation of the United States Constitution or BOP policy.

5.    Ordinarily, once an inmate has attempted to informally resolve the issue, the administrative remedy process is commenced by filing a Request for Administrative Remedy (Form BP-9) at the institution where the inmate is incarcerated. 28 C.F.R. § 542.13-14. Should the inmate's complaint be denied at the institution level, the inmate may appeal by filing a Regional Administrative Remedy Appeal (Form BP-10) with the Regional Office for the geographic region for which the inmate's current institution of confinement is located. *Id.* § 542.15(a). This is the second step in the process. For an inmate at the Federal Detention Center in Houston, Texas, (FDC Houston), this appeal would be filed with the South Central Regional Office (SCRO) of the BOP in Grand Prairie, Texas. If the Regional Office denies relief, the inmate, if dissatisfied, must appeal to the BOP's Office of General Counsel via a Central Office Administrative Remedy Appeal (Form BP-II). *Id.* This is the third and final step of the process. To properly exhaust all administrative remedies, an inmate must timely and properly present a claim to each level, have that remedy request accepted and receive an actual response to that request.

6.    BOP inmates have access to the administrative remedy forms (BP-9's, 10's and 11's) that are required to exhaust administrative remedies. Such forms are generally obtained from the inmates' assigned correctional counselors. 28 C.F.R. § 542.14. Per expressed BOP policy, inmates may obtain assistance from another inmate or from institution staff in preparing submissions of administrative remedies. 28 C.F.R. § 542.16.

7.    I have reviewed the BOP administrative remedy records for inmate Pedro Muniz, reg. no. 99022-179.

8.    Attachment 1 is a true and accurate copy of the BOP's SENTRY Administrative Remedy Generalized Retrieval report for inmate Muniz, showing all administrative remedy requests received from inmate Muniz.

9.    Attachment 1 shows that Muniz has submitted a total of 5 administrative remedy requests while incarcerated by BOP. The date that each administrative remedy request was received is noted under the column labelled "DATE-RCV."

The subject of each administrative remedy request is summarized in the top line of each entry.

10. Muniz's first administrative remedy request was received by the South Central Regional Office on December 16, 2010. The subject of this request was a Disciplinary Hearing Officer (DHO) hearing that occurred on November 10, 2010. This request was denied, as shown by the entry of "CLD" under the "STATUS" column. No appeal from this denial was received by the Office of General Counsel.

11. Muniz's remaining four administrative remedy requests were received in 2013, and concern a request for a kidney transplant or early release. See Attachment 1.

12. BOP's SENTRY database reflects that Muniz has not submitted any administrative remedy request concerning the medical treatment of his toe at FDC Houston in 2010. See Attachment 1.

(Docket Entry No. 20-1, Defendants' Motion for Summary Judgment, Ex. C, pp. 13-16).

Muniz was required under § 1997e(a) to exhaust administrative remedies before filing suit. *See* 28 U.S.C. § 1997e(a); *Johnson v. Johnson,* 385 F.3d 503, 515 (5th Cir. 2004). Muniz did not comply with the administrative deadlines and procedural rules for exhaustion and he does not identify or present a valid basis to excuse the exhaustion requirement. Muniz has not identified or presented evidence that he exhausted administrative remedies, as required to pursue any claims against the individual defendants. Dr. Roberto Garza, Dr. Anthony Cubb, Patrick Osayande, Tara Ross, and Vo Oanh are entitled to judgment as a matter of law on Muniz's civil-rights claims against them in their individual capacities.

## V.   The Tort Claims

The Federal Tort Claims Act ("FTCA," 28 U.S.C. §§ 1346(b), 2671–2680) is a limited waiver of the United States' immunity from tort lawsuits. *United States v. Orleans,* 425 U.S. 807, 813 (1976). The FTCA allows plaintiffs to sue the United States "for money damages, . . . for . . .

personal injury . . . caused by the negligent or wrongful act or omission" of any government employee acting within the scope of his employment. 28 U.S.C. § 1346(b).

The FTCA "is the exclusive remedy for compensation for a federal employee's tortious acts committed in the scope of employment." *McGuire v. Turnbo,* 137 F.3d 321, 324 (5th Cir. 1998). "To sue successfully under the FTCA, a plaintiff must name the United States as the sole defendant." *Id.* "All defendants other than the United States" should be dismissed for lack of subject matter jurisdiction. *Atorie Air, Inc. v. F.A.A.,* 942 F.2d 954, 957 (5th Cir. 1991); *King v. U.S. Dept. of Veterans Affairs,* 728 F.3d 410, 413 n.2 (5th Cir. 2013). Muniz cannot sue FCI-II Butner or the U.S. Attorney's Office under the FTCA. Nor can he sue the individual defendants, Patrick Osayande, Tara Ross, Oanh Vo, Dr. Roberto Garza, and Dr. Anthony Cubb, under the FTCA. The tort claims against these defendants are dismissed.

The remaining issue is whether Muniz has a valid tort claim against the United States under the FTCA. The FTCA waives the United States' immunity for damages claims based on torts committed by federal employees. 28 U.S.C. §§ 1346(b)(1), 2671–2680; *Ali v. Fed. Bureau of Prisons,* 552 U.S. 214, 217–18 (2008). The FTCA gives federal district courts jurisdiction over claims against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *Sheridan v. United States,* 487 U.S. 392, 398 (1988) (quoting 28 U.S.C. § 1346(b)). Because the alleged medical malpractice took place in Texas, Texas law controls. 28 U.S.C. § 1346(b)(1); *see also Ayers v. United States,* 750 F.2d 449, 452 n.1 (5th Cir. 1985) ("Under the [FTCA], liability for medical malpractice is controlled by state law.").

### A.    The Texas Law Requirements

In Texas, "health care liability claims are subject to strict pleading and proof requirements." *N. Am. Specialty Ins. Co. v. Royal Surplus Lines Ins. Co.,* 541 F.3d 552, 561 (5th Cir. 2008) (citing to TEX. CIV. PRAC. & REM. CODE ANN. §§ 74.001–.507). A plaintiff in a medical malpractice action "bears the burden of proving (1) the physician's duty to act according to an applicable standard of care; (2) a breach of that standard of care; (3) injury; and (4) causation." *Hannah v. United States,* 523 F.3d 597, 601 (5th Cir. 2008). The plaintiff must establish the standard of care before the factfinder may consider whether the defendant breached that standard. *Id.* Unless the mode or form of treatment is within common knowledge or lay experience, expert testimony is needed to prove the standard of care, its breach, and how the breach caused the harm. *See id.* at 601–02; *Quijano v. United States,* 325 F.3d 564, 567 (5th Cir. 2003). Examples of malpractice within common or lay knowledge include "negligence in the use of mechanical instruments, operating on the wrong portion of the body, or leaving surgical instruments or sponges within the body." *Haddock v. Arnspiger,* 793 S.W.2d 948, 951 (Tex. 1990). Subject to this narrow exception, a plaintiff must produce expert testimony to meet his burden of proof on a medical malpractice claim. *Hannah,* 523 F.3d at 601. Muniz argues that it is within lay knowledge that delaying treatment of an infection with proper antibiotics and follow-up care causes infection to spread. The Fifth Circuit has rejected a similar argument. In *Hannah v. United States,* 523 F.3d 597, 602, the court stated:

> That contention is belied by Hannah's descriptions of his treatment, which included antibiotics and surgeries. Because the mode of treatment for MRSA is not a matter of common knowledge or within the general experience of a layman, Hannah was required to present expert testimony to establish the applicable standard of care and to show how the care he received breached that standard. He neither designated nor hired an expert to testify on his behalf, so the district court properly granted summary judgment on the FTCA claim.

*Id.*

The medical standard of care for complications from cellulitis, an abscess, diabetes, and osteomyelitis is neither a matter of common knowledge nor within a layperson's general experience. Muniz must produce expert testimony to establish the applicable standard of care, to show that the treatment he received breached that standard, and to show that the breach caused the toe amputation.

**B.     The Expert Witness Muniz Wants to Use**

A federal court applies the state-law requirements on expert witnesses in medical malpractice cases. *See Rodriguez,* 980 F.2d at 1019 (applying TEX. REV. CIV. STAT. ANN. Art. 4590i § 14.01(a)(1), recodified in TEX. CIV. PRAC. & REM. CODE ANN. § 74.401); *see also Pesantes v. United States,* 621 F.2d 175, 179 (5th Cir. 1980) (ruling that for the FTCA claims, the district court was required to apply the state's qualification requirements for standard-of-care experts). In Texas, § 74.401 provides the qualification requirements for an expert in medical malpractice cases. *See Scoresby v. Santillan,* 346 S.W.3d 546, 561 (Tex. 2011) (Johnson J. dissenting). Section 74.401(a) states:

> (a)  In a suit involving a health care liability claim against a physician for injury to or death of a patient, a person may qualify as an expert witness on the issue of whether the physician departed from accepted standards of medical care only if the person is a *physician* who:
>
> (1)  is practicing medicine at the time such testimony is given or was practicing medicine at the time the claim arose;
>
> (2)  has knowledge of accepted standards of medical care for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
>
> (3)  is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of medical care.

*Id.* (emphasis added). The expert must be a "physician." This term is defined in § 74.401(g):

> (g)  In this subchapter, "physician" means a person who is:
>
> (1)  licensed to practice medicine in one or more states in the United States; or

> (2) a graduate of a medical school accredited by the Liaison
> Committee on Medical Education or the American Osteopathic
> Association only if testifying as a defendant and that testimony relates
> to that defendant's standard of care, the alleged departure from that
> standard of care, or the causal relationship between the alleged
> departure from that standard of care and the injury, harm, or damages
> claimed.

TEX. CIV. PRAC. & REM. CODE § 74.401(g).

The defendants argue that Espinosa, a nurse practitioner, does not qualify as an expert under Texas law because she is not a licensed medical doctor and because she "has not provided a curriculum vitae or indication of how her background as a nurse practitioner uniquely qualifies her to give an expert opinion on the applicable standard of care for physicians practicing at the Bureau of Prisons in Texas." (Docket Entry No. 22, p.3). The defendants also argue that her declaration is inadmissible under FRE 702 and *Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579 (1993), because her "opinions offer no scientific, technical or other specialized knowledge that will assist the court to understand the evidence or determine a fact in issue," "does not provide the facts or data that she considered in forming her opinions," and "has not shown that she has the requisite knowledge or experience to render a professional medical opinion with regard to Pedro Muniz's condition and care he received." (*Id.*). The defendants point out that "Espinosa does not indicate that she has examined Muniz. She has apparently not read his chart seems to have no knowledge of the history of his treatment, or the fact that he was seen and treated by outside orthopedist Dr. Barnes at the St. Joseph Medical Center, who agreed with the treatment that Muniz was receiving at the BOP. Nurse Espinosa makes no mention of the fact that Mr. Muniz was unable to be seen by Dr. Barnes because of a serious blood clot in this leg." (*Id.*).

Espinosa does not meet the Texas statutory requirements to qualify as an expert witness. *See* TEX. CIV. PRAC. & REM. CODE § 74.401(a), (g). Because she fails to meet those requirements, it is not necessary to decide if she is also unqualified Evidence Rule 703.

Muniz must present expert testimony to establish a standard of care. *Hannah v. United States,* 523 F.3d 597, 601 (5th Cir. 2008). Muniz's failure to present admissible, competent evidence from a qualified expert witness prevents him from establishing the standard of care, a necessary element for his medical malpractice claim. Muniz has presented no evidence of a standard of care that was breached and caused his toe amputation. The United States is entitled to judgment as a matter of law on Muniz's FTCA claim.

## VI. Conclusion

The defendants' motion to dismiss is granted as to the civil-rights claims against the individual and government entity defendants; the motion for summary judgment is granted as to the tort claims against the federal government and the individual defendants sued in their individual capacities. (Docket Entry No. 20). Muniz's motion to supplement response, (Docket Entry No. 21), and motion to file response, (Docket Entry No. 23), are granted. Any remaining pending motions are denied as moot. Final judgment is entered by separate order.

SIGNED on March 9, 2015, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge